**United States District Court**
For the Northern District of California

1

2

3                        UNITED STATES DISTRICT COURT

4                       NORTHERN DISTRICT OF CALIFORNIA

5

6

7    TERRANCE RICKS,

8              Plaintiff,                         No. C 11-3637 PJH

9         v.                                      **ORDER GRANTING DEFENDANT'S
                                                  MOTION FOR SUMMARY JUDGMENT**
10   UNITED AIR LINES, INC.,

11             Defendant.
     _____/
12

13        Defendant's motion for summary judgment came on for hearing before this court on

14   February 20, 2013.  Plaintiff appeared by his counsel Richard Rogers, and defendant

15   appeared by its counsel Hope Case.  Having read the parties' papers and carefully

16   considered their arguments and the relevant legal authority, the court hereby GRANTS the

17   motion.

18                                  **BACKGROUND**

19        This is an employment case, alleging discrimination based on disability, age, and

20   race; failure to prevent discrimination; and failure to accommodate and engage in the

21   interactive process.  Plaintiff Terrance Ricks is currently employed by defendant United

22   Airlines, Inc. ("United") as an engine mechanic.  He began working at United in December

23   1989 as a radio electric mechanic at the Oakland airport.

24        When United's Oakland facility closed, plaintiff transferred to the San Francisco

25   Maintenance Center ("SFOPD") where he worked as a general mechanic for approximately

26   two years.  Plaintiff held other mechanic positions at the SFOPD, and around 2003 or 2004,

27   submitted and won a bid to become an engine mechanic, the same position he holds today.

28   At no time since he was hired in 1989 has plaintiff been terminated by United.

United States District Court

For the Northern District of California

1    Because plaintiff was a unionized mechanic, his work rules, pay, and working

2    conditions at United during the relevant time period were governed by the collective

3    bargaining agreement ("CBA") entered into between United and the Aircraft Mechanics

4    Fraternal Association (the "Union").[1]  As a party to the CBA, United is obligated to follow its

5    terms and conditions.

6    The CBA sets forth a detailed process for obtaining job transfers and promotions at

7    United, and United and employees who are covered by the CBA, like plaintiff, must follow

8    that process.  For example, the CBA requires that covered employees such as plaintiff bid

9    for positions they want; and positions are awarded based on seniority plus the ability to

10   satisfactorily perform the duties required for the job in question.  Bids are required to be in

11   writing, filed with United, and bids must be also filed with the union.  Bids are valid only

12   through January 15th of the year following the year in which they are submitted.

13   Before any transfers are fulfilled, United is obligated to inform the local union about

14   the number of vacancies, the job qualifications, the duties to be performed, and the names

15   of the individuals whom United has identified as the successful bidders.  Even after an

16   employee is a successful bidder, he is subject to a 90-day trial period in the desired

17   position, "in order to demonstrate his ability to perform the work required by the job."

18   Employees who feel they are aggrieved during this process may file grievances under the

19   procedures dictated by the CBA.  Plaintiff was familiar with this bidding process, as he

20   testified in his deposition that he placed bids for positions at United prior to his 2006 injury,

21   and that he obtained his position as an engine mechanic through a successful bid.

22   The engine mechanic position is safety-sensitive and physically demanding.  A

23   number of the essential physical requirements are set forth in the "SFOPD Mechanic

24   Minimum Physical Requirements" (the "MPR").  According to the deposition testimony of

25   Andrew ("Andy") Boots, who at the time of plaintiff's injury was a supervisor at SFOPD, the

26   MPR does not provide an exhaustive list of essential physical requirements, and,

27   _____

28   [1]    Since 2008, employees in plaintiff's position have been represented by the International Brotherhood of Teamsters.

2

depending on where a particular job assignment took place, any of the requirements would or could be encountered on any given day.

In his deposition, plaintiff confirmed that the MPR list reflects the physical aspects of his job as an engine mechanic at United.  Plaintiff described his job as being "at one location for eight hours" and involving "[a] lot of standing, sitting."  He would "take [engines] apart . . . put [engines] back together, various stages, hang [engines] on rails, take [engines] off rails, put [engines] on stands."  Some of the required duties in this position include:

- The ability to stand approximately 75-100% percent of the work shift;
- The ability to lift turbine engine parts up to 35 pounds and to constantly lift tools weighing up to 25 pounds;
- Using tools which require considerable grip strength;
- The ability to work engines, horizontally as well as vertically, where bending and stooping while using hand tools is common and continuous during the shift;
- Turning and twisting from work stands to engine parts, and from tool boxes to engine parts, continuously during a shift;
- Reaching up, down, and out, pushing, and pulling, all continuously during the shift.

The MPR states that "[a]lthough not all the listed activities are required of a given Mechanic on a given day, it is highly probable that over a two or three day period a Mechanic would encounter most, if not all, these requirements," adding that "[a]n employee should not have any limitations of manual dexterity that would prevent his assignment anywhere within Production over a long period of time."

In March 2006, plaintiff suffered an on-the-job injury, which prevented him from performing his engine mechanic job.  Following the incident, plaintiff was taken off work by his physician, who stated that plaintiff could do himself harm if he continued to work, given his injuries.

1      Under the CBA, plaintiff was eligible for a leave of absence lasting two years, with

2  the possibility of extension, during which he could use accrued sick leave time to receive

3  his regular pay and continue to accrue seniority.  Following that period, under the CBA,

4  plaintiff was eligible for Extended Illness Status ("EIS") for up to three years, during which

5  he could continue to accrue seniority, vacation and travel benefits.

6      Plaintiff began a leave of absence, and received full pay for two years by using sick

7  time, and also received state disability benefits and workers' compensation payments.

8  Plaintiff continued to be eligible for medical coverage, continued to accrue vacation

9  benefits, and continued to accrue seniority while out on leave.

10      On May 20, 2008, plaintiff's personal physician, Dr. John Karan, signed a United

11  "Employee Work Status Form" releasing plaintiff to return to "modified duty for 6 months"

12  with certain restrictions in pushing, pulling, carrying, lifting, gripping, and repetitive hand

13  use (none more than 2 hours), and noting in addition "avoid repeated use left hand."  In a

14  letter also dated May 20, 2008, Dr. Karan stated that he had evaluated plaintiff that day in

15  his office, that he was recommending that plaintiff be released to work with "modified duty;"

16  that he had advised plaintiff to avoid repetitive use of his hands and also not to lift weight

17  greater than 20 pounds; and that he had filled out the form in detail with restrictions, which

18  should be continued for six months.

19      In June 2008, plaintiff notified United he had been released for duty, based on the

20  form signed by Dr. Karan.  United also received a report from Dr. Oscar Abeliuk, the

21  physician chosen by plaintiff and United to serve as the Agreed Medical Examiner ("AME")

22  for plaintiff's industrial injury.   In his June 6, 2008 report, Dr. Abeliuk opined that plaintiff

23  had reached maximum medical improvement, and that there were a number of ongoing

24  restrictions in place for him.

25      Specifically, Dr. Abeliuk's report indicated that plaintiff was restricted from repetitive

26  bending at the cervical spine level; forceful pushing, pulling or torqueing using the left upper

27  extremity; and heavy lifting using both upper extremities.  The report concluded, "Therefore,

28  [plaintiff] is unable to return to his usual occupation."

4

United States District Court

For the Northern District of California

1    According to the report, plaintiff had also told Dr. Abeliuk that he did "not believe that

2  he can return to his usual occupation as an aircraft engine mechanic."  Plaintiff confirmed in

3  his deposition that he had made that statement to Dr. Abeliuk; he also testified, however,

4  that he actually believed that he could return to his job as an engine mechanic if his

5  medical restrictions were accommodated.

6    In his declaration filed in opposition to the present motion, plaintiff asserts that he

7  could have performed all the duties of an engine mechanic as of June 2008, based on his

8  knowledge of those duties – that is, his assessment of what those duties consist of, based

9  on what he has been doing since returning to work in 2011.  However, he does not explain

10  exactly why his restrictions as of June/July 2008 would not have precluded him from

11  performing the essential duties of the job as set forth in the MPR (and as he identified

12  those duties in his deposition).

13    According to Kathleen Tetrev, who at the time was employed as a labor relations

14  representative at United, and since July 2011 has been employed as the Human

15  Resources Manager for Technical Operations in the Western Region for United, after

16  plaintiff inquired about returning to work, a "reasonable accommodation process" or "RAP"

17  meeting was scheduled, pursuant to United's policy.  This is a part of the formal process in

18  place for employees who have long-term (90+ days) medical limitations.

19    According to Ms. Tetrev, under the RAP policy, United's management initially

20  contacts and works with the employee and all other necessary parties to identify whether

21  an accommodation is possible for a position being held or sought.  Management then

22  makes a determination as to what, if any, limitations the employee has.  If a current

23  employee cannot be accommodated on the job he was performing when the limitations

24  occurred, local management works with Human Resources and the employee to identify

25  any alternate jobs that the employee might be qualified to perform with or without an

26  accommodation.  The Union can also offer suggestions during a RAP meeting.  .

27    The first RAP meeting was held on July 23, 2008, and was attended by plaintiff,

28  United supervisors, Union representatives, an HR representative, and a worker's

5

United States District Court

For the Northern District of California

1   compensation specialist.  During the meeting, the participants discussed plaintiff's physical

2   limitations, and determined that, based on those restrictions, he was unable to perform his

3   job duties.  The participants also discussed the possibility of plaintiff's pursuing another

4   position that would be consistent with his physical limitations.

5        In his opposition to United's motion, plaintiff argues that the RAP meetings were "a

6   charade, a show lacking substance."  He claims that Andy Boots (whom he identifies as

7   "the decisionmaker" with respect to denying his requests for return to work) and Joanne

8   Borg said they did not want him returning to the engine shop.  Plaintiff asserts further that

9   "no one actually investigated, assessed, or evaluated the actual essential job functions" of

10  his job by visiting the job site.  He claims that the actual lifting requirements, for example,

11  are not as onerous as indicated in the MPR.

12       For its part, United asserts that it took steps to see if plaintiff could be

13  accommodated in a subassembly plant.  However, Andy Boots testified in his deposition

14  that United determined that plaintiff's physical restrictions prevented him from working in

15  such a position.  Plaintiff testified that at the time of the July 23, 2008 RAP meeting, he had

16  not placed any bids on file for alternate positions.  After the RAP meeting, United provided

17  plaintiff with information regarding open positions, and regarding United's internal bid

18  placement process.

19       Following his initial two-year leave, plaintiff was placed on EIS starting September 2,

20  2008, per the terms of the CBA.  In total, plaintiff was out on EIS for approximately three

21  years beyond the initial two-year leave.  While out on EIS, plaintiff placed bids for other

22  union positions at United.

23       All union positions are awarded based on seniority, provided the person is qualified

24  for and has the ability to satisfactorily perform the job.  According to Ms. Tetrev, of the

25  positions for which plaintiff bid that actually had openings, he was the successful bidder by

26  seniority on four.  On those occasions, he twice failed the qualifying test, and once lacked

27  the requisite qualifications.

28       The fourth was a position in the tire shop.  A RAP was held to consider whether

6

United States District Court

For the Northern District of California

1   plaintiff could perform the duties of this position, with a reasonable accommodation if

2   appropriate.  However, that position was even more physically demanding than plaintiff's

3   engine mechanic job, and as plaintitff conceded in his deposition, it was determined that he

4   could not perform the job given his restrictions.

5          United continued to communicate with plaintiff during this period regarding his

6   medical status, and regarding his bidding for positions while he was out on EIS – updating

7   him on the bids he had on file – and RAP meetings.  Plaintiff's union representatives also

8   had the ability to check on the bids plaintiff had on file as well as any open positions that

9   were posted.  Five RAP meetings in total were held involving plaintiff between June 2008

10  when he announced he could return to work, and September 2011, when he did in fact

11  return to work.

12         In September 2008, United received what it characterized as conflicting information

13  from plaintiff's treating physician and the AME review, and advised plaintiff that it needed to

14  obtain further clarification regarding his physical capabilities and his medical status.  On

15  September 16, 2008, United's Medical Department issued an assessment of functional

16  capacities, which limited plaintiff as follows:  no repetitive bending at the cervical spinal

17  level; no forceful pushing, pulling, or torqueing using the left upper extremity (hand); and no

18  lifting over 50 pounds.  These restrictions were to be in place for at least six months.  Mr.

19  Boots communicated with Ms. Tetrev about the 50-pound limitation on September 16,

20  2008, and Ms. Tetrev indicated she was in contact with plaintiff's physician.

21         Mr. Boots wrote plaintiff a letter on November 12, 2008, stating that United's Medical

22  Department had subsequently received a call from plaintiff's physician stating that plaintiff

23  had a 10-pound lifting restriction and therefore could not return to work; and that the

24  supplemental report from the AME indicated that the restrictions in the original report

25  remained in place.  However, plaintiff's physician, Dr. Karan, submitted a declaration in

26  opposition to the present motion, stating that he had "no recollection of telling anyone,

27  including United Airlines, that [plaintiff] had a 10 pound lifting restriction."  He added that

28  had he done so, he would have noted it in plaintiff's chart, but that there was no such

7

1   notation in the chart.

2        On December 29, 2008, plaintiff filed a complaint of discrimination with the California

3   Department of Fair Employment and Housing ("DFEH"), which was subsequently also sent

4   to the Equal Employment Opportunity Commission ("EEOC") for processing.  In his DFEH

5   charge, plaintiff checked the box for "discrimination based on disability," and alleged that he

6   had been denied reasonable accommodation on July 23, 2008, and that he had been told

7   by his supervisor Andy Boots that there was no work for him.

8        Plaintiff also alleged that be believed he had been denied reasonable

9   accommodation based on his disability (left median neuropathy), age (56) and race (African

10  American), based on the following facts – (a) that on June 4, 2008 he submitted to Andy

11  Boots a doctor's note indicating modified duty for six months, and Mr. Boots informed him

12  there was no work for him; (b) that on July 23, 2008, he was given a reasonable

13  accommodation hearing and his accommodations were denied; and (c) that he had

14  knowledge of a younger Caucasian co-worker who sustained an injury which resulted in a

15  disability and was brought back to work with accommodation.

16       That is, plaintiff alleged that he had been denied reasonable accommodation based

17  on his disability, age, and race, and that the last act of discrimination occurred on July 23,

18  2008 (the date of the first RAP meeting with union representatives and United).  Plaintiff

19  never filed any subsequent charges with DFEH or the EEOC.

20       On November 9, 2009, Dr. Abeliuk reported that plaintiff's restrictions were no heavy

21  lifting with upper extremity; no repetitive pushing, pulling, or torqueing with the left upper

22  extremity; no repetitive use of the left upper extremity at or above shoulder level; no change

23  in work preclusions for the cervical spine.

24       On June 4, 2010, the EEOC issued a determination, finding that the evidence

25  indicated that United had failed to provide plaintiff with a reasonable accommodation, in

26  violation of the ADA.  In particular, the EEOC noted that the evidence showed that United

27  failed to provide plaintiff with a transfer (to another job, presumably) because it required

28  that he "competitively self-nominate."

United States District Court
For the Northern District of California

8

1    The EEOC noted further that United's "written policy governing the transfer process

2  states that employees seeking a reasonable accommodation transfer may need to be more

3  than minimally qualified for the position in question."  The EEOC found that this policy "is

4  exclusionary to disabled individuals requiring reassignment as a form of reasonable

5  accommodation."  The EEOC also found insufficient information to establish a violation of

6  Title VII or the Age Discrimination in Employment Act.

7    The EEOC advised that its representative would contact the parties in the near

8  future to begin an informal attempt at conciliation.  There is no information in the papers

9  submitted about any further activity at the EEOC – or indicating the date of any right-to-sue

10  letter, from the EEOC or from DFEH.

11    On October 29, 2010, Dr. Karan reported that plaintiff could return to work with no

12  restrictions.  United responded that it needed additional information because the

13  recommendation was in direct conflict with the latest AME report, but that it was also

14  sending the information to its Medical Department for evaluation.  Plaintiff was eventually

15  cleared to return to work in September 2011.

16    Meanwhile, on July 25, 2011, plaintiff filed the complaint in the present action, and

17  then on September 21, 2011, filed a first amended complaint ("FAC").  In the FAC, plaintiff

18  first alleges certain facts, some of which are accompanied by legal conclusions, and then

19  lists six causes of action – (1) violation of the ADA; (2) violation of the ADEA; (3) violation of

20  Title VII; (4) violation of Government Code § 12940(a); (5) violation of Government Code §

21  12940(k); and (6) violation of Government Code §§ 12940(m), (n).  The "causes of action"

22  simply state the bare-bones conclusion that United's conduct violated the various statutes

23  indicated.

24    In the present motion, United has interpreted the six causes of action as alleging

25  (1) discrimination and failure to accommodate, in violation of the Americans With

26  Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; (2) discrimination in violation of

27  the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, et seq.;

28  (3) discrimination on the basis of race, in violation of Title VII of the 1964 Civil Rights Act,

United States District Court

For the Northern District of California

1   42 U.S.C. § 2000e-2, et seq. ("Title VII"); (4) discrimination [presumably on the basis of

2   disability, race, and age] in violation of the Fair Employment and Housing Act ("FEHA"),

3   Cal. Govt. Code § 12940(a); (5) failure to prevent discrimination, in violation of FEHA, Cal.

4   Govt. Code § 12940(k), and (6) failure to accommodate and failure to engage in a good

5   faith interactive process, in violation of FEHA, Cal. Govt. Code §§ 12940(m), (n).

6        United now seeks summary judgment as to all causes of action.  At the hearing,

7   plaintiff's counsel conceded that plaintiff has no viable claim for age discrimination.  Thus,

8   the court addresses United's motion only as to the claims of discrimination on the basis of

9   disability (including failure to accommodate and failure to engage in a good-faith interactive

10  process); discrimination on the basis of race; and failure to prevent discrimination.

**DISCUSSION**

12  A.    Legal Standard

13       A party may move for summary judgment on a "claim or defense" or "part of . . . a

14  claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

15  no genuine dispute as to any material fact and the moving party is entitled to judgment as a

16  matter of law.  Id.

17       A party seeking summary judgment bears the initial burden of informing the court of

18  the basis for its motion, and of identifying those portions of the pleadings and discovery

19  responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.

20  v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

21  of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

22  material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

23  verdict for the nonmoving party.  Id.

24       Where the moving party will have the burden of proof at trial, it must affirmatively

25  demonstrate that no reasonable trier of fact could find other than for the moving party.

26  Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

27  the nonmoving party will bear the burden of proof at trial, the moving party can prevail

28  merely by pointing out to the district court that there is an absence of evidence to support

United States District Court

For the Northern District of California

1   the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its

2   initial burden, the opposing party must then set out specific facts showing a genuine issue

3   for trial in order to defeat the motion.  Anderson, 477 U.S. at 250; see also Fed. R. Civ. P.

4   56(c), (e).

5   B.      Defendant's Motion

6          1.      Failure to exhaust administrative remedies as to post-July 2008 events

7          As an initial matter, United argues that plaintiff's FAC and administrative charge put

8   at issue only his treatment between December 29, 2007, and July 23, 2008.  United

9   contends that because plaintiff stated under penalty of perjury in the DFEH charge (filed in

10  December 2008) that United's most recent act of discrimination took place on July 23,

11  2008, and because he never filed an amended, supplemented, or revised charge, he

12  cannot now seek to recover for alleged discrimination that occurred after that date.

13  Similarly, United notes, the complaint in the present lawsuit, which was filed in 2011,

14  references his employment only through Jul 23, 2008.  At most, United argues, plaintiff can

15  base his lawsuit only on events that occurred within the year before he filed his DFEH

16  complaint (that is, events back to December 29, 2007), and up to July 23, 2008; and that

17  any claims after that date are precluded for failure to exhaust administrative remedies.

18         In opposition, plaintiff argues that the complaint puts at issue his treatment between

19  June 2008 and September 2011 (when he returned to work).  He claims that it was not

20  necessary for him to amend his administrative charge or file a new one for the period after

21  July 23, 2008 because the actions that postdated July 23, 2008 were "like or reasonably

22  related to" the acts on that date and before.  That is, what plaintiff terms United's "refusal to

23  reinstate" him in July 2008 is, in his view, "like or reasonably related to" to the "continuing

24  refusal to reinstate" him from July 2008 until September 2011.

25         A lawsuit following the exhaustion of administrative remedies may encompass any

26  discrimination that is "like and reasonably related to" the allegations made in the

27  administrative charge of discrimination, including acts of discrimination that occur after the

28  charge is filed.  See Couveau v. American Airlines, Inc., 218 F.3d 1078, 1082 (9th Cir.

United States District Court

For the Northern District of California

1   2000); <u>E.E.O.C. v. Farmer Bros. Co.</u>, 31 F.3d 891, 899 (9th Cir. 1994); <u>see also</u> <u>Okoli v.</u>

2   <u>Lockheed Tech. Operations Co.</u>, 36 Cal. App. 4th 1607, 1615 (1995).  In <u>Okoli</u>, the court

3   observed that "if an investigation of what <u>was</u> charged . . . would necessarily uncover other

4   incidents that were not charged, the latter incidents could be included in a subsequent

5   (civil) action.  <u>Id.</u>, 36 Cal. App. 4th at 1615.

6       Thus, for example, in <u>Josephs v. Pacific Bell</u>, 443 F.3d 1050 (9th Cir. 2006), the

7   plaintiff alleged wrongful termination in his administrative charge, and alleged both

8   termination and failure to reinstate him in his complaint.  The Ninth Circuit found that the

9   plaintiff's claim that the employer refused to reinstate him unquestionably related to his

10  termination claim, because the employer allegedly failed to reinstate him for the same

11  discriminatory reason that it terminated him.  <u>Id.</u> at 1062.  Similarly, in <u>Couveau</u>, the plaintiff

12  filed an administrative charge alleging that the employer had failed to reinstate her in 1988,

13  and later filed a civil action alleging failure to reinstate and a later unlawful termination.  The

14  Ninth Circuit held that the allegedly discriminatory termination was "like or reasonably

15  related to" the failure to reinstate her.  <u>Couveau</u>, 218 F.3d at 1082.

16      Here, plaintiff alleged in his administrative charge, which he filed on December 29,

17  2008, that he had been "terminated" effective July 23, 2008.  Thus, United was on notice

18  that plaintiff had alleged that the last discriminatory act occurred on July 23, 2008, and any

19  administrative investigation of his charge of discrimination would likely have involved only

20  an investigation of the events that preceded and surrounded the decision on July 23, 2008.

21      The alleged failure to accommodate in July 2008 grew in part out of United's

22  decision, based on the reports of medical evaluations, that there was no position available

23  in which plaintiff could be accommodated, based on his physical limitations.  However, any

24  subsequent decisions would have been based on other medical evaluations, as well as on

25  the positions that were potentially available to plaintiff at that time in accordance with the

26  provisions of the CBA.

27      Nor do the allegations in the FAC, which was filed on September 21, 2011, provide a

28  clear indication that it was plaintiff's intention to allege a continuing failure to provide a

United States District Court

For the Northern District of California

1   reasonable accommodation, "like or reasonably related to" the alleged discrimination that

2   occurred on July 23, 2008, such that United would have been on notice of his intention to

3   allege discrimination for the entire period up until he was cleared for return to work in

4   September 2011.

5        In the FAC, plaintiff asserts that he "was employed by defendant United Air Lines,

6   Inc., as an Aircraft Engine Mechanic from December 11, 1989, until July 23, 2008, FAC

7   ¶ 3; that "during his employment," he was injured, and that because of his disability, United

8   "failed and refused" to return him to work in June 2008, "and thereafter," FAC ¶¶ 4-5; and

9   that since June 2008, United "has permitted" him to apply for vacant positions, but "has

10   refused to place him in vacant positions," FAC ¶ 9.

11        It was not until plaintiff filed his opposition to the present motion that United was

12   placed on notice that he intended to assert discrimination, failure to accommodate, and

13   failure to engage in a good-faith interactive process based on events that occurred up to

14   September 2011 when he finally returned to work.  The court is mindful of the standards

15   articulated by the Ninth Circuit in Couveau and Josephs, but finds that the facts in this case

16   are sufficiently distinguishable so as to make events following July 23, 2008 to be not "like

17   or reasonably related" to those of July 23, 2008.  Accordingly, the court agrees with United

18   that the claims must be limited to events occurring up to July 23, 2008.

19        2.        Disability discrimination claims

20        United argues that summary judgment should be granted in its favor as to plaintiff's

21   claims of disability discrimination.  Absent direct evidence of discrimination (which does not

22   exist in this case), a plaintiff alleging disability discrimination in employment must show that

23   he has a disability; that he is a qualified individual, meaning that he can perform the

24   essential functions of his job with or without reasonable accommodation; and that he

25   suffered an adverse employment action because of his disability.  Kennedy v. Applause, 90

26   F.3d 1477, 1481 (9th Cir. 1996); see also Lawler v. Montblanc North America, LLC, 704

27   F.3d 1235, 1242 (9th Cir. 2013) (elements of prima facie case under FEHA are that plaintiff

28   is a member of a protected class, was performing competently in the position he held, and

United States District Court

For the Northern District of California

1  suffered adverse employment action; and that some other circumstance suggests a
2  discriminatory motive).

3      Under the McDonald Douglas burden-shifting analysis, if a plaintiff makes this prima
4  facie showing of discrimination, the burden shifts to the employer to articulate a legitimate
5  nondiscriminatory reason for the allegedly discriminatory conduct.  Godwin v. Hunt
6  Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998); see also Lawler, 704 F.3d at 1242.
7  Finally, if the employer successfully articulates a nondiscriminatory reason for its decision,
8  the burden shifts back to the plaintiff to show that the articulated  reason was a pretext for
9  discrimination.  Id.

10     Here, United argues that the claims of disability discrimination, failure to
11 accommodate, and failure to engage in a good faith interactive process all fail.  With regard
12 to the claim of disability discrimination, United asserts that the evidence indicates that
13 plaintiff was not a "qualified individual" when he sought to return to work; that plaintiff's
14 contention that he could have performed his essential job duties is without merit; and that
15 plaintiff cannot establish any discriminatory pretext behind United's decision to keep him on
16 leave in 2008.

17     First, United contends that plaintiff was not a "qualified individual" when he sought to
18 return to work in June and July of 2008, based on the assessments of Drs. Karan and
19 Abeliuk, which imposed medical restrictions that prevented plaintiff from performing many
20 types of physical activities that were central to the stated duties of the engine mechanic
21 position.

22     As indicated above, the MPR states that the an engine mechanic must be able to
23 stand approximately 75 to 100 percent of his shift; lift turbine engine parts weighing up to
24 35 pounds; constantly lift fixtures, nut runners, Sweeny equipment, and other tools
25 weighing up to 25 pounds; bend and stoop continuously throughout the shift; work engines,
26 horizontally as well as vertically, where bending and stopping while using hand tools is
27 common; turn and twist continuously during the shift, use tools including drill motors,
28 grinders, and rivet squeezer, some of which require considerable grip strength,

United States District Court
For the Northern District of California

1    continuously during a shift; and continuously push and pull tool box rollaways, parts on

2    rolling pallets, rolling fixtures, and hand tools.

3        In the face of this, the evidence shows that plaintiff was restricted by his doctors

4    from heavy lifting, and was ordered to avoid repetitive bending, forceful pushing, forceful

5    pulling, and forceful torqueing.  In addition, he had limited use of his left arm, and was

6    restricted in the amount of time he could engage in such activities as lifting and carrying.

7    Indeed, plaintiff concedes in the FAC that he had restrictions on "lifting, pushing, pulling,

8    and twisting."  FAC ¶ 7.  United notes that plaintiff confirmed the effect of these restrictions

9    when he told Dr. Abeliuk in May 2008 that he did not believe he could return to his usual

10   occupation as an aircraft engine mechanic.

11       United also notes that the extent of plaintiff's injuries was evident in May 2009, a

12   year after he made the statement to Dr. Abeliuk (and Dr. Abeliuk found plaintiff unable to

13   return to work), when a Workers Compensation Appeals Board Administrative Law Judge

14   found that plaintiff had numerous limitations in his ability to move his head, upper

15   extremities, and low back, with little change since 2008, and plaintiff himself testified in the

16   proceeding that he had difficulty with prolonged standing and with bending.  United asserts

17   that plaintiff has no viable argument that he was capable of performing the essential job

18   duties of his position in June and July of 2008 when he sought to return to work.

19       In his deposition, plaintiff asserted that he could perform the duties of the job, and

20   suggested that United could have accommodated him by "looking the other way," and/or by

21   removing some of the essential functions of his job and giving those functions to other

22   employees.  However, United contends, plaintiff has been unable to identify any way his

23   restrictions could have been accommodated in his job, other than to relieve him of basic

24   duties, which simply confirms that he was unable to perform the basic functions of the job.

25       United argues that an employer is not obligated to reallocate essential job functions

26   to other employees, to create a new job for an employee, or to relieve an employee from

27   performing essential job functions.  Thus, United argues, plaintiff's requested

28   "accommodation" is essentially unreasonable.

United States District Court

For the Northern District of California

1    United contends it is unreasonable for the additional reason that it asks that the CBA

2   between United and the Union be disregarded.  In his responses to interrogatories, when

3   asked how United discriminated against him on the basis of race, age, and disability,

4   plaintiff responded that United failed to accommodate him, that he was aware of a

5   "Caucasian male on day shift in the Engine Shop that has been accommodated by only

6   doing wire wrapping and connector repairs;" that he (plaintiff) was qualified to do such

7   work; that he was told by United management that he could not be accommodated in the

8   Engine Shop; and that United failed to engage in a good-faith interactive process to

9   ascertain what jobs he could perform.

10   United contends that because the CBA prescribes specific procedures by which jobs

11   are filled, such that United could not unilaterally create a new position for plaintiff or transfer

12   plaintiff to another position on which he had not bid, plaintiff's argument  amounts to an

13   assertion that United was required to disregard the CBA entirely.

14   An employer's seniority system – particularly where set forth in a CBA – will trump

15   an employee's requested accommodation for policy reasons.  See U.S. Airways, Inc. v.

16   Barnett, 535 U.S. 391, 403-04 (2002).  Thus, unless there is more, a showing that a

17   requested assignment would violate the rules of a seniority system warrants summary

18   judgment for the employer.  Id. at 406.  Indeed, the Ninth Circuit has held that where a CBA

19   includes a "bona fide seniority system," and there is a "direct conflict between the proposed

20   accommodation and the collectively-bargained seniority rights of other employees," the

21   requested accommodation is per se unreasonable.  Willis v. Pacific Maritime Ass'n, 244

22   F.3d 675, 682 (9th Cir. 2001); see also 2 C.C.R. 7293.9(d)(5).

23   Finally, United argues that even if plaintiff could meet the elements of the prima facie

24   case as set forth above, he cannot establish any discriminatory pretext behind United's

25   decision to keep him on leave in 2008.  In order to rebut an employer's showing of a

26   nondiscriminatory motive, a plaintiff must provide evidence showing that a discriminatory

27   reason more likely motivated the employer or that the employer's proffered reason is

28   unworthy of credence.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248,

1   256 (1981).

2        Here, United asserts, the evidence shows that it was advised of physical restrictions

3   placed on plaintiff by his physicians, which appeared to prevent him from performing the

4   essential functions of his job, and that there is no evidence that there was another available

5   position for which plaintiff was qualified at the time.  United contends that the evidence

6   shows it reviewed the reports from plaintiff's doctors, directed personnel to interface with

7   plaintiff about his restrictions, engaged in a RAP meeting with plaintiff on July 23, 2008,

8   and, when it was established that plaintiff could not return to his job, provided him with the

9   accommodation of a continued leave of absence (though without pay, as provided in the

10  CBA).

11       United contends that plaintiff has no evidence that would show pretext on United's

12  part.  United notes that while Drs. Karan and Abeliuk provided different opinions on the

13  extent of plaintiff's disability in the June-July 2008 timeframe, both doctors nonetheless

14  opined that plaintiff had a number of physical restrictions, which involved a variety of

15  actions such as pushing, pulling, lifting, and carrying.

16       Similarly, United asserts, plaintiff's allegations that United failed to reasonably

17  accommodate him and did not engage in a good-faith interactive process are belied by the

18  record, and those claims fail as well.  United contends that because plaintiff was unable to

19  perform the essential duties of his job, it provided him with a reasonable accommodation by

20  maintaining him on a leave of absence for what eventually amounted to five years (two

21  years paid and three years unpaid), during which time he continued to accrue seniority,

22  vacation pay, and travel benefits.  At the end of this period, after plaintiff had recovered

23  sufficiently to work, he was returned to his regular job.

24       United also contends that plaintiff's comparisons to Eric Braunberger (the "younger

25  Caucasian employee" identified by plaintiff in his responses to interrogatories as having

26  been accommodated by transfer to the Engine Shop)  are unavailing, as Mr. Braunberger

27  testified that his was not a "light duty" position, that he is not medically restricted from

28  performing any of the duties of the engine mechanic position, and he does not view the

United States District Court
For the Northern District of California

17

1   expectations for his job as being different from those of any other engine mechanics.

2   Moreover, United notes, plaintiff was unable to state in his deposition whether Mr.

3   Braunberger actually had a disability, what disability he had, or whether he had any lifting,

4   bending, pushing, pulling, twisting, or turning restrictions such as those plaintiff had in

5   2008.

6        As for whether it engaged in a good-faith interactive process, United contends that

7   the evidence shows that it repeatedly engaged in an interactive process with plaintiff until

8   plaintiff returned to work as an engine mechanic (once his condition improved) in 2011.

9   United asserts that it followed up with plaintiff numerous times to determine his medical

10  status and restrictions; that it held five RAP meetings between 2008 and 2011, attended by

11  plaintiff, union representatives, and United personnel; that it explored options after those

12  RAP meetings; that it informed plaintiff when his status changed to EIS; and that it assisted

13  plaintiff with submission of bids for positions in which he was interested.

14       In opposition, plaintiff focuses on the reasonable accommodation claim and the

15  claim that United failed to engage in a good-faith interactive process.

16       Under the ADA, a plaintiff can make out a prima facie case of failure to

17  accommodate by showing that he is disabled within the meaning of the ADA; that he is a

18  qualified individual able to perform the essential functions of the job with reasonable

19  accommodation; and that he suffered an adverse employment action because of the

20  disability.  Samper v. Providence St. Vincent Med. Center, 675 F.3d 1233, 1237 (9th Cir.

21  2012).

22       Under FEHA, where failure to accommodate is a separate provision in the statute, a

23  plaintiff can establish a prima facie case of failure to accommodate by showing that he

24  suffers from a disability covered by FEHA; that he is otherwise qualified to do his job; and

25  that the employer failed to reasonably accommodate his disability.  Jensen v. Wells Fargo

26  Bank, 85 Cal. App. 4th 245, 256 (2000).  In any event, a plaintiff claiming failure to

27  accommodate under either the ADA or FEHA must show that he is able to perform the

28  essential functions of the job.  Kennedy, 90 F.3d at 1482; see also Lawler, 704 F.3d at

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1242-43

Plaintiff argues that United used the "wrong standard" in analyzing whether plaintiff was able to perform the essential functions of his position, because it compared his medical restrictions to the "generic" descriptions in the MPR, a document covering all mechanic positions. Plaintiff asserts that each case requires an "individualized assessment," which he claims was not done here by United.

Plaintiff also contends that because he and his union representative argued at the first RAP on July 23, 2008 that he could return to work in the Engine Shop, and because United "never looked at the actual job duties" as performed, and failed in its burden of showing what the essential functions of the job actually are or were, United has not established that plaintiff was not qualified to perform the essential functions of the job. As for Mr. Boots' declaration, and his conclusions as to why plaintiff could not perform the essential elements of the job (based on his own experience as a mechanic and supervisor of mechanics), plaintiff contends that Mr. Boots is not qualified to make this assessment because he is not an expert in body mechanics or in vocational issues.

Finally, plaintiff asserts that United failed to reasonably accommodate his disability and failed to engage in a good faith interactive process. He claims that these two issues are "intertwined." He reiterates that United did not engage in the interactive process in good faith because it did not explore reasonable accommodation in good faith, and in fact, offered no accommodation whatsoever.

The court finds that the motion must be GRANTED. First, plaintiff has not established a prima facie case of disability discrimination because he has failed to show that he was a qualified individual able to perform the essential functions of his job. As for plaintiff's argument that the MPR did not accurately describe the physical requirements of the job, plaintiff has no evidence to support that assertion, but simply relies on a declaration that he filed in opposition to the motion, in which he claims that he is currently (in his position as an engine mechanic) not required to lift more than 20 pounds. Nevertheless, plaintiff conceded in his deposition that the MPR captured the physical part

19

United States District Court

For the Northern District of California

1    of the job of engine maintenance mechanic at United – which includes the requirement that

2    the mechanic be able to lift 35 pounds.  In addition, plaintiff's current claim that his job does

3    not require heavy lifting conflicts with his prior deposition testimony in which he asserted

4    that he needed an accommodation for heavy lifting.

5         Plaintiff claims that the MPR is just a "generic" list of possible job functions for

6    mechanic positions, and that it was improper for United to simply rely on the MPR when

7    making its determination that plaintiff could not perform the essential functions of the job.

8    He claims that the actual job as he has been performing it does not include all those

9    physical requirements (though he does not clearly explain how they differ, or provide any

10   evidence other than his own declaration).  He asserts that United should have done a study

11   of the actual job as it was performed, rather than simply relying on the "generic"

12   description.  He contends that United has not met its "burden" of showing that he could not

13   meet the job requirements.  However, this argument ignores the rule that it is the plaintiff's

14   burden, under the <u>McDonnell Douglas</u> burden-shifting framework, to establish a prima facie

15   case of discrimination.

16        In addition, the law is clear that courts must give deference to an employer's

17   judgment about what functions are essential for service in a particular position.  <u>See</u>, <u>e.g.</u>,

18   <u>Lui v. City and County of San Francisco</u>, 211 Cal. App. 4th 962, 971-72 & n.9 (2012).

19   Moreover, plaintiff has provided no alternative list of "essential" job requirements in support

20   of his suggestion that the MPR is not accurate.  In any event, the evidence presented

21   shows that plaintiff's physical restrictions in June/July 2008 involved more than a heavy

22   lifting restriction.

23        United has also provided a declaration from Andy Boots, who has extensive

24   experience working as a mechanic at United and also supervising employees at SFOPD.

25   Mr. Boots provides a lengthy description of some of the job duties of plaintiff's position –

26   hanging engines; raising engines up; pushing back and forward on engines; and a great

27   deal of stooping, bending, and lifting.  Mr. Boots also states that when he received plaintiff's

28   Employee Work Status Form, signed by Dr. Karan on May 20, 2008, and submitted to

United, he compared listed restrictions to what he knew of the duties of plaintiff's position, and the MPR, and based on that comparison determined that plaintiff could not perform the essential duties of the job and that no reasonable accommodation would permit him to do so.

As for plaintiff's requests for an accommodation, plaintiff has provided no evidence showing that he could have performed the duties required by a position in subassembly, or that any opening in subassembly existed.  The evidence shows that Mr. Boots investigated whether plaintiff might be able to work in subassembly, but concluded that plaintiff's physical limitations precluded such a transfer.  Plaintiff's only response to this is his assertion in his declaration that he "could have performed that job from June, 2008, to the present."  This statement is speculative, and is devoid of any facts.  Plaintiff has failed to create a triable issue of fact because he has submitted no evidence that there was a position available in subassembly at the time he inquired about returning to work, or that he submitted a timely bid for any such position (as required by the CBA).

Significantly, plaintiff also fails to address the issue of the CBA and its requirement that employees who want transfers must bid on positions, or the clear law in the Ninth Circuit that where a CBA includes a "bona fide seniority system," and there is a "direct conflict between the proposed accommodation and the collectively-bargained seniority rights of other employees," the requested accommodation is per se unreasonable.  See Willis, 244 F.3d at 682; see also 2 C.C.R. 7293.9(d)(5) (to same effect).

Plaintiff was allowed a five-year leave of absence, during which time he continued to accrue seniority and vacation time, and other benefits such as health insurance.  An employer is not required to provide the accommodation demanded by the employee, but need only provide some reasonable accommodation.  Zivkovic v. Southern Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002).  A request that the employer reallocate or reassign an essential part of the employee's job (the part he cannot do) to another employee is not a reasonable accommodation.  See, e.g., Dark v. Curry County, 451 F.3d 1078, 1089 (9th Cir. 2006).

United States District Court

For the Northern District of California

1   More to the point, the evidence establishes that a lengthy RAP meeting was held on

2   July 23, 2008, after plaintiff requested to return to work, in which his physical limitations

3   were discussed, along with how he could return to work.  While plaintiff claims that the RAP

4   meeting simply provided "lip service" to the idea of the interactive process, he has identified

5   no false or contrived action by United, and has not even attempted to show any way in

6   which the interactive process broke down.

7   As noted above, United has argued that post-July 2008 events are not relevant to

8   plaintiff's claims in this case, because the last act of discrimination alleged in the DFEH

9   charge is the "termination" on July 23, 2008, while plaintiff has argued that the post-July

10  2008 events are "like or reasonably related to" the events up to July 23, 2008 because the

11  gist of plaintiff's disability discrimination claim is a "continuing failure to reinstate."  For the

12  reasons stated, the court has found that the post-July 2008 events are not "like or

13  reasonably related to" the earlier events.

14  Nevertheless, even if plaintiff's DFEH charge and the FAC can be read as

15  incorporating post-July 2008 events, the evidence shows that plaintiff was not a "qualified

16  individual" during the later period because the physical limitations set forth in the medical

17  evaluations in 2008 and 2009, when compared with the physical requirements of the

18  engine mechanic job, demonstrated that he was not able to perform the essential functions

19  of the job.  It was not until late October 2010 that Dr. Karan reported that plaintiff could

20  work with no restrictions, and, in view of the fact that plaintiff had been off work for four and

21  a half years at that point, United required some time for further evaluation before

22  determining that he could return to his former position as an engine mechanic.

23  Similarly, with regard to the alleged failure to accommodate and failure to engage in

24  a good-faith interactive process, plaintiff was repeatedly accommodated by United with an

25  extended leave of absence and continued accrual of seniority rights and other benefits, and

26  was eventually reinstated to his former position of engine mechanic when he was physically

27  able to do the work.  The evidence reflects a continued dialogue between United and

28  plaintiff over the extent of his physical restrictions and whether they could be

22

United States District Court
For the Northern District of California

1   accommodated, within the seniority and bidding requirements of the CBA.  United held at

2   least five RAP meetings between June 2008, when plaintiff announced he could return to

3   work, and September 2011, when he did in fact return to work, and also provided him with

4   information regarding open positions and United's internal bid placement process.

5          Finally, with regard to the EEOC reasonable cause determination, such a

6   determination does not create a genuine issue of disputed fact sufficient to withstand

7   summary judgment.  In Coleman v. Quaker Oats Co., 232 F.3d 1271 (9th Cir. 2000), the

8   Ninth Circuit held that while an EEOC letter may be a probative evaluation of an individual's

9   discrimination complaint, and may properly be admitted into evidence, such letters are not

10  homogeneous products, and vary greatly in quality and factual detail.  Id. at 1283-84

11  (citations and quotations omitted).

12         The EEOC letter at issue in Coleman stated that the Commission found reasonable

13  cause to believe that the defendant had violated the ADEA, but the court found that it was

14  impossible to know from the letter what facts the EEOC considered or how it analyzed

15  them, and concluded that when such letters report only "bare conclusions," they have little

16  probative value.  Id. at 1284.  Similarly, in this case, the EEOC letter contains no

17  explanation as to how the opinion of reasonable cause was reached, and no discussion of

18  what facts were considered by the investigator who authored the letter.  Thus, plaintiff's

19  reliance on the EEOC letter as evidence of discrimination is misplaced.

20         3.      Claim of racial discrimination

21         United asserts that plaintiff's claim of racial discrimination fails because it is based

22  on pure speculation.  In his deposition, plaintiff testified that he objected to "the way I was

23  treated," claiming that Andy Boots had told him that "he didn't give a damn what I did" when

24  he attempted to return to work in June 2008.  Plaintiff asserted that he was "sure" that Mr.

25  Boots would not have spoken that way to a "younger Caucasian," and added that Mr. Boots

26  "is a racist," though unable to say why, other than "the way he treated me."

27         In the absence of any direct evidence of discrimination, the court applies the

28  McDonnell Douglas burden-shifting analysis.  To establish a prima facie case of

                                        23

United States District Court
For the Northern District of California

1  discrimination based on race, plaintiff must show that he belongs to a protected class, that

2  he was qualified for the job, that he experienced an adverse employment action, and that

3  some other circumstance suggests a discriminatory motive for the alleged adverse action,

4  such as that similarly-situated employees outside his race were treated more favorably.

5  See, e.g., Moran v. Selig, 447 F.3d 748, 753 (9th Cir. 2006); Guz v. Bechtel Nat'l, Inc., 24

6  Cal. 4th 317, 354 (2000).  Here, plaintiff has not established the fourth element, as he has

7  provided no evidence of other circumstances that suggest a discriminatory motive.

8        The only "evidence" that plaintiff has offered is the fact that he is African-American,

9  and that he believes that United treated another disabled Caucasian employee – Mr.

10  Braunberger – better.  A bare assertion that employees are of different races is insufficient

11  to suggest that there existed a discriminatory motive behind an employment decision.  See,

12  e.g., Ramirez v. County of Marin, 2011 WL 5080145 at *4-5 (N.D. Cal. Oct. 25, 2011); see

13  also Ortega v. Regents of Univ. of Cal., 2012 WL 5988638 at *7 (N.D. Cal. Nov. 29, 2012).

14  Plaintiff has provided no evidence showing that Mr. Braunberger was given a light-duty job

15  relieved of many required job functions.

16        In his opposition, plaintiff contends that United has "cherry-picked" the evidence, as

17  it mentions only plaintiff's assertion that United accommodated Mr. Braunberger (white), but

18  ignores plaintiff's testimony in his deposition that United also accommodated Carl Longo,

19  Dave Roper, and Dale Mitchell (all white).  In addition, plaintiff asserts that United

20  precluded him from taking Mr. Mitchell's deposition, by refusing to allow plaintiff to depose

21  Mr. Mitchell long after discovery had closed.

22        Plaintiff also argues that there is "a great deal of evidence of Mr. Boots' hostility

23  toward [plaintiff] returning to work."  He claims that Mr. Boots refused to accept Dr. Karan's

24  release to work forms, refused to accept Dr. Abeliuk's clearance of restrictions, refused to

25  accept United's Medical Department clearance; fabricated a statement by the Union that

26  plaintiff could not use his left hand; and apparently fabricated a verbal report by Dr. Karan

27  that plaintiff had a 10-pound lifting restriction.  Plaintiff also contends that United has

28  provided no explanation for the 10-month delay from October 29, 2010 (the date of Dr.

United States District Court
For the Northern District of California

1   Abeliuk's clearance) and September 19, 2011 (the date of his return to work).

2      The court finds that the motion must be GRANTED, as plaintiff has failed to provide

3   evidence sufficient to establish a prima facie case of discrimination based on race.  His

4   claim is entirely based on uncorroborated allegations, and the sheerest speculation that

5   there was preferential treatment based on race, in the form of accommodations given to

6   other employees but not to him.

7      In his deposition, plaintiff mentioned purported accommodations given to Mr.

8   Braunberger, Mr. Longo, Mr. Roper, and Mr. Mitchell, but he has offered no evidence

9   showing what, if any, disability they suffered from, what their physical limitations were and

10  how they compared to the physical requirements of their respective positions, or what the

11  alleged  accommodation was.  Indeed, he conceded that he did not know whether the

12  employees he speculated were accommodated had a medical restriction, had a disability,

13  or needed an accommodation – the only conclusion he could reach was that they were not

14  African-American.

15     Plaintiff's claim about the "hostility" demonstrated by Mr. Boots is similarly

16  uncorroborated, as plaintiff has pointed to no improper remarks based on race or any other

17  protected characteristic.  In short, there is no evidence whatsoever (apart from plaintiff's

18  "feelings" about Mr. Boots) of any racial animus.  Moreover, United has established that Mr.

19  Boots could not have "rejected" Dr. Karan's reports, as it is United's policy that its Medical

20  Department receives those forms, not individual supervisors.  As for plaintiff's claim that Mr.

21  Boots manufactured a conversation with Dr. Karan, it is clear from the evidence that Mr.

22  Boots was simply relaying information received from the Medical Department and asking

23  plaintiff for clarification as to his physical capabilities and medical status.  This does not in

24  any way indicate that Mr. Boots actually spoke with plaintiff's doctor.

25     As for plaintiff's claim that he was unable to take Mr. Mitchell's deposition, plaintiff

26  waited until January 2013, well after the discovery cutoff, before inquiring about

27  rescheduling the deposition.  However, plaintiff failed to seek leave of court as required by

28  the local rules.

1      4.     Claim of failure to prevent discrimination

2      United contends that because plaintiff has no viable claim of discrimination under

3 FEHA, he has no viable claim for failure to prevent discrimination under Cal. Govt. Code

4 § 12940(k).  In his opposition, plaintiff asserts that he agrees with United's statement of the

5 law, but argues that because he has shown that he was discriminated against, he does not

6 agree that the failure-to-prevent claim is not viable.

7      The court finds that the motion must be GRANTED.  There can be no independent

8 claim for failure to prevent discrimination absent an underlying claim of discrimination under

9 FEHA.  Trujillo v. North County Transit Dist., 63 Cal. App. 4th 280, 288-89 (1998); see also

10 Snedden v. ABF Freight Sys., 489 F.Supp. 2d 1124, 1132-33 (S.D. Cal. 2007).

11 **CONCLUSION**

12      In accordance with the foregoing, defendant's motion for summary judgment is

13 GRANTED.

14      To the extent that the court relied on any evidence to which the parties filed

15 objections, those objections are OVERRULED.

16

17 **IT IS SO ORDERED.**

18 Dated:  March 13, 2013

19                                    PHYLLIS J. HAMILTON

20                                    United States District Judge

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California